COURT OF APPEALS OF VIRGINIA

Present:  Judges Petty, O'Brien and Russell
Argued at Lexington, Virginia

**PUBLISHED**

CLINARD GARY LAMBERT

v.       Record No. 1762-17-3

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE MARY GRACE O'BRIEN
MARCH 12, 2019

FROM THE CIRCUIT COURT OF RUSSELL COUNTY
Michael Lee Moore, Judge

Robert M. Galumbeck (Galumbeck & Kegley, Attorneys, on brief),
for appellant.

Rachel L. Yates, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.

A jury convicted Clinard Gary Lambert ("appellant") of aggravated involuntary manslaughter, in violation of Code § 18.2-36.1, and driving while intoxicated, in violation of Code § 18.2-266. The court imposed the jury's sentence of seven years of incarceration for manslaughter and a $1,500 fine for driving under the influence.

Appellant asserts three assignments of error. First, he contends the court erred by not allowing him to question a witness, now a former state trooper, "regarding his conviction of soliciting a prostitute and the reasons for his termination of employment with the Virginia State Police." In his second and third assignments of error, appellant challenges the sufficiency of the evidence that he "self-administered the drugs which impaired his ability to drive" and that he had taken the "drugs prior to the accident and at a time when they or it would have affected his driving safely." Finding no error, we affirm.

FACTUAL BACKGROUND

We review the evidence in the light most favorable to the prevailing party at trial, the Commonwealth. Commonwealth v. Hudson, 265 Va. 505, 514 (2003). So viewed, the evidence established that on March 1, 2015, Donna Turner was driving her Chevrolet Cavalier across Big A Mountain in Russell County, with Forrest Ramey in the passenger seat. Appellant, who was operating a pickup truck, crossed the center line and collided with Turner's vehicle. Ramey later died as a result of blunt force injuries sustained in the collision.

Claude Musick was driving on the same road as Turner and appellant. He heard a "big thump" and saw a truck pressed against the guardrail when he looked in his rearview mirror. Musick immediately turned around and drove back toward the accident site. He was the first person at the scene.

Shortly after Musick, another driver, Tammy Brown, arrived with one of her friends and saw that the parties involved in the collision were still inside their vehicles. Brown assisted Turner, and Brown's friend helped appellant out of his truck. Brown testified that appellant appeared "dazed," "wobbly on his feet," and was bleeding profusely. Appellant was standing beside the truck, and Brown did not see him eat, drink, or take any medication after the accident.

Greta Morrison, a member of the Lebanon Lifesaving Crew, responded to the accident. According to Morrison, who also works as an assistant chief nurse at the local hospital, appellant was conscious and alert but had "some slurred speech." When she spoke to appellant, he denied consuming any drugs or alcohol prior to driving. Morrison testified that she thought appellant suffered an orbital fracture and also believed he was under the influence of drugs or alcohol. She stated that appellant was not given any medication at the accident scene or during his transport to the hospital. Emergency personnel took Turner and Ramey to the hospital as well.

Randy Osborne, a state trooper at the time, also responded to the accident. Osborne testified that during his twenty-year employment with the Virginia State Police, he investigated approximately ten accidents per month, although he was not on the accident reconstruction team. Virginia State Police policy did not require him to call a reconstructionist because there were no fatalities at the scene. Osborne testified that based on his investigation, he determined that appellant's truck "crossed the center line[,] . . . struck the guardrail[,] . . . and scrubbed up against the guardrail for approximately forty feet." From the damage to the passenger side of the Cavalier, Osborne concluded that Turner tried to avoid the truck before the collision.

Osborne testified that he spoke with appellant at the accident scene for approximately five to ten minutes. Although appellant initially denied consuming any drugs or alcohol before driving, he subsequently admitted that he had "just come back" from receiving a methadone treatment at a local clinic. Osborne observed that appellant had glassy eyes, appeared sleepy, and needed to lean on the guardrail for support. Osborne obtained a search warrant for appellant's blood; a subsequent chemical analysis revealed the presence of methadone, alprazolam (commonly known as Xanax), and nordiazepam.

Dr. James Kuhlman, Jr., a forensic toxicologist, testified that the low level of nordiazepam was probably a metabolite from Valium that appellant consumed several days before the accident and likely did not affect appellant's driving. However, in his opinion, the individual levels of methadone and alprazolam were "more significant." Each of the three drugs has depressant effects and can cause drowsiness, dizziness, lethargy, slowed hand-eye coordination, slurred speech, and altered balance. Dr. Kuhlman testified that the combination of Xanax and methadone can be dangerous if the user is not accustomed to taking those drugs together. Although Dr. Kuhlman acknowledged that a head injury could produce similar side effects, he concluded that the drug levels present in appellant's blood could have impaired his driving.

Osborne testified that he spoke with Turner four days after the accident, following her hospital discharge. She recounted that as she came around a curve, appellant's pickup truck was "completely on her side" and she was not able to avoid it.

To support a defense that his conduct after the collision was attributable to his injuries, appellant presented evidence from Dr. Gayle Suzuki, a medical examiner subpoenaed by the Commonwealth. Dr. Suzuki testified that, although her practice "deal[s] with dead people," she could opine that a nose fracture can cause bleeding, which could possibly affect speech if the blood flows down the throat. She also stated that "it just depends" how an orbital fracture, head injury, or nose fracture occurs in determining whether it can cause disorientation and motor skill impairment.

PROCEDURAL HISTORY

The Commonwealth filed a motion *in limine* to prohibit appellant from referring to a pending criminal charge against Osborne. At the pre-trial hearing, appellant argued that he was entitled to introduce evidence that Osborne had a pending charge and was suspended from his employment as a state trooper. He asserted that the proposed evidence was relevant to impeach Osborne's credibility. The court granted the Commonwealth's motion to exclude the challenged evidence.[1]

The parties proceeded to trial, and at the conclusion of the Commonwealth's case, appellant moved to strike the evidence. He argued that the Commonwealth had not established that the drugs in his blood were self-administered or that he was under their influence at the time he was driving. The court denied appellant's motion and denied his renewed motion to strike at the conclusion of the evidence.

---

[1] The specific charge referenced in the motion *in limine* was not proffered to the trial court or made part of the record on appeal.

ANALYSIS

A.  Exclusion of evidence concerning former Trooper Osborne

Appellant contends that the court erred by not allowing him to question former Trooper Osborne that sometime after the accident he was convicted of soliciting a prostitute.  He also argues that he was entitled to introduce evidence that Osborne was suspended and ultimately terminated from his employment as a result of the conviction.  We review the court's ruling concerning admissibility of evidence for an abuse of discretion.  See Midkiff v. Commonwealth, 280 Va. 216, 219 (2010).

Initially, we note that the evidence excluded by the trial court differs from the evidence identified in appellant's assignment of error.  At the pre-trial hearing, the charge against Osborne, which was unspecified in the record, was merely pending; he had not been convicted.  Additionally, he had not yet been terminated, only suspended.  The court's ruling prohibited appellant from introducing unadjudicated conduct, not evidence of a solicitation conviction or employment termination as he asserts in his assignment of error.  Accordingly, we review only the court's ruling as to the impeachment evidence actually challenged below:  the pending charge and suspension.  See Rule 5A:18 ("No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling[.]").

Appellant contends that the challenged evidence was admissible to impeach Osborne's credibility.  Virginia Rule of Evidence 2:607(a) provides that "the credibility of a witness may be impeached by any party other than the one calling the witness, with any proof that is relevant to the witness's credibility."  Proper forms of impeachment evidence under Rule 2:607(a) include:

    (i)    introduction of evidence of the witness's bad general reputation for the traits of truth and veracity, as provided in Rule 2:608(a) and (b);

    (ii)    evidence of prior conviction, as provided in Rule 2:609;

(iii)  evidence of prior unadjudicated perjury, as provided in Rule
2:608(d); [and]

. . . .

(viii)  any other evidence which is probative on the issue of
credibility because of a logical tendency to convince the trier of
fact that the witness's perception, memory, or narration is
defective or impaired, or that the sincerity or veracity of the
witness is questionable.

Rule 2:608(a) permits impeachment by reputation evidence of "truthfulness or untruthfulness," subject to certain limitations.  However, "specific instances of the conduct of a witness may not be used to attack or support credibility [and] may not be proved by extrinsic evidence."  Va. R. Evid. 2:608(b).  See also Banks v. Commonwealth, 16 Va. App. 959, 963 (1993).  A party may question a witness about prior specific acts of misconduct in circumstances of unadjudicated perjury or prior false accusations in sexual assault cases.  Va. R. Evid. 2:608(d)-(e).  In other circumstances, impeachment evidence may include specific acts of misconduct "to show that a witness is biased or has motive to fabricate."  Banks, 16 Va. App. at 963.

Appellant concedes that the impeachment evidence he sought to introduce consisted of specific acts of conduct expressly prohibited by Rule 2:608(b).  He does not contend that the acts were relevant to show that Osborne was biased or had a motive to fabricate his testimony.  See Banks, 16 Va. App. at 963.  Instead, he argues that the evidence was relevant to "lessen[] the impact of [Osborne's] unwavering testimony as a trooper and would have cast doubts on his ability to make proper judgment calls."  Because the evidence appellant sought to introduce was not proper impeachment material under the Virginia Rules of Evidence, the court did not abuse its discretion by excluding it.  See Va. R. Evid. 2:607(a).

B. Sufficiency of evidence that the drugs were "self-administered" and that appellant was driving under the influence

Appellant contends the evidence was insufficient to establish that he self-administered any of the drugs found in his blood and that he was driving under the influence of an intoxicant. When considering the sufficiency of the evidence, we will reverse a conviction "only if the trial court's decision is 'plainly wrong or without evidence to support it.'" Kelly v. Commonwealth, 41 Va. App. 250, 257 (2003) (*en banc*) (quoting Davis v. Commonwealth, 39 Va. App. 96, 99 (2002)). "[W]e ask only if 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Johnson v. Commonwealth, 58 Va. App. 303, 313-14 (2011) (quoting Maxwell v. Commonwealth, 275 Va. 437, 442 (2008)).

1. Self-administration of the drugs

Code § 18.2-266 provides in relevant part:

> It shall be unlawful for any person to drive or operate any motor vehicle . . . while such person is under the influence of any narcotic drug or any other *self-administered* intoxicant or drug of whatsoever nature, or any combination of such drugs, to a degree which impairs his ability to drive or operate any motor vehicle . . . safely.

(Emphasis added).[2] Relying on Jackson v. Commonwealth, 274 Va. 630 (2007), appellant contends that the drugs in his blood were not "self-administered" and therefore the Commonwealth failed to prove a violation of Code § 18.2-266. We disagree.

Jackson was a case of pure statutory construction. 274 Va. at 633-34. In Jackson, the Supreme Court considered whether Code § 18.2-266 requires the Commonwealth to prove

---

[2] The Commonwealth was required to prove the elements of driving under the influence, in violation of Code § 18.2-266, in order to establish that appellant was guilty of aggravated involuntary manslaughter under Code § 18.2-36.1. Code § 18.2-36.1 provides that "[a]ny person who, as a result of driving under the influence in violation of clause (ii), (iii), or (iv) of § 18.2-266 . . . unintentionally causes the death of another person, shall be guilty of involuntary manslaughter."

self-administration as an element of the offense. Id. The Commonwealth argued that the phrase "any narcotic drug or any other self-administered intoxicant or drug of whatsoever nature" meant that the self-administration requirement applied only to "intoxicant[s] or drug[s]" and not to "any narcotic drug." Id. at 633 (quoting Code § 18.2-266). The Court rejected this argument and held that the statute requires proof of self-administration regardless of the intoxicating substance involved. Id. at 634.

However, in Jackson, the Supreme Court did not address the issue in this case, what constitutes "self-administration" of a drug. See id. at 632-35. Here, the Commonwealth does not dispute that Code § 18.2-266 requires self-administration to prove a violation of the statute. Rather, it argues the evidence was sufficient to show that appellant *did* self-administer the drugs. Therefore, the issue is not one of statutory construction but sufficiency of the evidence, and on appeal we do not reweigh the evidence or substitute our judgment for that of the factfinder. English v. Commonwealth, 58 Va. App. 711, 717-18 (2011).

The evidence at trial established that appellant had methadone, alprazolam, and nordiazepam in his blood at the time it was drawn. In separate conversations with Morrison and Osborne, appellant initially denied consuming any alcohol or drugs before driving. He later admitted to Osborne that he had received a dose of methadone at a treatment clinic just before the accident, but the record contains no direct evidence of how he obtained the dose. Despite the lack of evidence at trial concerning how appellant ingested the alprazolam or nordiazepam found in his blood, the factfinder was entitled to conclude that appellant had taken the drugs and initially lied about not consuming them to conceal his guilt. See, e.g., Dugger v. Commonwealth, 40 Va. App. 586, 593-94 (2003). It was reasonable for the factfinder to believe that appellant did not want to admit having taken alprazolam or nordiazepam, especially in combination with the methadone.

Appellant's methadone dose occurred in a voluntary treatment program where he agreed to ingest the substance by his participation in the program. Taken to its logical conclusion, appellant's position would allow heroin users who voluntarily inject each other with the controlled substance to claim that the drugs were not self-administered. Regardless of the procedure used to ingest the methadone, the evidence was sufficient to find that appellant self-administered the drugs found in his blood, as required by Jackson to prove a violation of Code § 18.2-266.

2. Driving under the influence of an intoxicant

Appellant also contends that the Commonwealth did not meet its burden to show that he was under the influence of drugs while driving because he could have consumed the drugs found in his blood after the accident. To establish a violation of Code § 18.2-266, the Commonwealth must prove that appellant drove "while . . . under the influence of any narcotic drug or any other self-administered intoxicant or drug of whatsoever nature, or any combination of such drugs, to a degree which impairs his ability to drive or operate any motor vehicle . . . safely." Elements of a crime may be proved by direct or circumstantial evidence. Hudson, 265 Va. at 512. Here, both direct and circumstantial evidence support the conclusion that appellant was driving under the influence of drugs.

Appellant cites Fowlkes v. Commonwealth, 194 Va. 676 (1953), and Bland v. City of Richmond, 190 Va. 42 (1949), in support of his argument that the evidence failed to exclude the possibility that he could have consumed the drugs found in his system after the accident. However, both Fowlkes and Bland are distinguishable. The Supreme Court determined that a reasonable factfinder could have concluded that the defendants consumed alcohol after the accidents because no evidence established the precise time of the accidents or the defendants' behavior following the collisions. Fowlkes, 194 Va. at 684-85; Bland, 190 Va. at 45-46.

- 9 -

Here, appellant admitted to Osborne at the accident scene that he had "just come back" from receiving a dose of methadone at a local treatment clinic. Unlike Fowlkes and Bland, appellant's admission proved that he consumed methadone prior to the accident. Dr. Kuhlman testified that the level of methadone in appellant's blood was "significant" and that the drug can cause depressant effects that impair the ability to drive including lethargy, dizziness, slowed hand-eye coordination, and difficulty balancing. This evidence alone was sufficient to support the jury's conclusion that appellant was under the influence of an intoxicant while driving.

The circumstantial evidence of the alprazolam further bolstered the factfinder's determination that appellant was under the influence of drugs at the time of the accident. Dr. Kuhlman testified that the level of alprazolam in appellant's blood was also "significant" and could be especially "dangerous" when taken in combination with methadone. Further, there was no evidence that appellant was unattended from the time that Tammy Brown arrived at the accident scene moments after the collision. Brown testified that she observed appellant's condition and that she did not see him consume anything from the time she arrived until the medical personnel appeared. A member of the Lebanon Lifesaving Crew also testified that she was with appellant from her arrival until emergency personnel transported him to the hospital. She stated that no one administered any medication to him during this time period. Brown and Osborne noted that appellant had glassy eyes, slurred speech, appeared sleepy, and needed to lean on the guardrail for support. These symptoms corresponded with the depressant effects that Dr. Kuhlman testified could be produced by consumption of the drugs found in appellant's blood. Therefore, appellant's initial false statement, the observations of witnesses and medical personnel of appellant's physical condition, and the lack of evidence that he consumed anything after the accident also support the factfinder's conclusion that appellant was driving under the influence of self-administered intoxicants at the time of the collision.

CONCLUSION

The court did not err in excluding the proffered evidence concerning former Trooper Osborne. Further, the evidence adduced at trial supported the jury's conclusion that appellant violated Code § 18.2-266 by driving his vehicle under the influence of self-administered drugs. For those reasons, we affirm appellant's convictions for driving while intoxicated and aggravated involuntary manslaughter.

<u>Affirmed.</u>